Frederick P. McGINNIS, Commissioner of the Department of Health and Social Services, and Charles G. Adams, Jr., Director of the Division of Corrections, Department of Health and Social Services, Appellants,

v.

H. C. R. STEVENS, and all other persons presently imprisoned, in custody, or in any manner detained under the authority of the Commissioner of the Department of Health and Social Services, Appellees.

H. C. R. STEVENS, and all other persons presently imprisoned, in custody, or in any manner detained under the authority of the Commissioner of the Department of Health and Social Services, Cross-Appellants,

v.

Frederick P. McGINNIS, Commissioner of the Department of Health and Social Services, and Charles G. Adams, Jr., Director of the Division of Corrections, Department of Health and Social Services, Cross-Appellees.

Nos. 2255, 2312.

Supreme Court of Alaska.

Dec. 1, 1975.

Ivan Lawner and Gerald O. Williams, Asst. Attys. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellant and cross-appellees.

Robert H. Wagstaff, of Wagstaff & Middleton, Anchorage, for appellees and cross-appellants.

## OPINION

Before RABINOWITZ, C. J. and CONNOR, ERWIN, BOOCHEVER, and BURKE, JJ.

RABINOWITZ, Chief Justice.

First impression issues relating to constitutional and statutory rights of Alaskan prisoners are presented by this appeal.

Among the multiplicity of deprivations asserted by appellees in their superior court complaint for declaratory and injunctive relief is that inmates under the jurisdiction of the Department of Health and Social Services of the State of Alaska are denied due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Alaska Constitution.[1] Due process infringements were alleged to have resulted from appellants' arbitrary removal of inmates' statutory good time;[2] from appellants' arbitrary administration of internal prison discipline, in particular punitive segregation procedures; and from appellants' arbitrary administrative decisions relating to inmate institutional placements and participation in work release and education programs.

At the root of this litigation lie questions of the contours and substance of the due process rights to which a prisoner is entitled in prison disciplinary hearings under the federal and Alaska constitutions. Appellees' due process claims in relation to inmate disciplinary hearings are grounded upon contentions that inmates are, as a matter of constitutional due process, entitled: to the assistance of counsel; to present witnesses in their behalf; to confront and cross-examine witnesses; to the application of a guilt beyond a reasonable doubt standard; to a hearing before an impartial tribunal; to notice affording adequate time to prepare for the hearing, and; to automatic appeal to the court system from adverse institutional disciplinary decisions.

After a nonjury trial, the superior court held that the classification and disciplinary procedures employed by appellants governing Alaskan prisoners under their jurisdiction do not satisfy constitutionally mandated standards of due process. Declaring numerous aspects of Alaska's prison procedures constitutionally infirm the superior court permanently enjoined appellants from continuation of these impermissible procedures and proceeded to fashion a detailed and comprehensive decree governing institutional discipline and security.[3]

Shortly after the superior court entered its decree in the case at bar, the Supreme Court of the United States handed down the seminal opinion of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L. Ed.2d 935 (1974). The issues in *Wolff*, which involved federal due process disciplinary claims by inmates of the Nebraska prison system, were substantially similar to the disciplinary issues presented in the instant case. Reaffirming that an inmate is a "person" for purposes of the Fourteenth Amendment, the Supreme Court in *Wolff* held that forfeiture of statutory good time and placement in "solitary" confinement each constitutes deprivation of "liberty"

---

1. Article I, Section 7 of the Alaska Constitution provides in part:
 No person shall be deprived of life, liberty, or property, without due process of law.

2. There are three categories of "good time" available to Alaskan prisoners. They are: good time granted pursuant to AS 33.20.010 when the prisoner has "faithfully observed all the rules and has not been subject to punishment"; good time given in the discretion of the Commissioner for meritorious service under AS 33.20.020(b) ; and good time earned for work performed, AS 33.20.020(a).

3. One of the arguments advanced by the state in this appeal is that the superior court's comprehensive specification of procedural rights, including stringent deadlines (some within hours) for stages of the disciplinary process, distorts the proper role of the judiciary. *See* page, 1238, *infra*.

under the Fourteenth Amendment.[4] Mr. Justice White, writing for the majority in *Wolff*, took pains to emphasize:

. . . that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.[5]

Short of the full panoply of rights accorded an accused in criminal proceedings, the Supreme Court in *Wolff* held that when major prison disciplinary proceedings are instituted against a state inmate, the following procedural safeguards are mandated by the Due Process Clause:[6] at least twenty-four hours advance written notice of the alleged violation;[7] a written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action;[8] permitting the inmate facing disciplinary action to call witnesses and to present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals;[9] and allowing an illiterate inmate, or an inmate

4. See *Haines v. Kerner*, 404 U.S. 519, 94 S.Ct. 594, 30 L.Ed.2d 652 (1972) ; *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed. 2d 418 (1971) ; *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

5. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (1974).

6. We have characterized the type of disciplinary proceedings in question in *Wolff* as major because its consequences involved some of the most severe punishments possible at an administrative level, namely : loss of statutory good time, placement in solitary confinement, or removal of any or all privileges for extended periods of time.

There are essentially three types of official activity which are involved in the due process aspects of this case. First, prison authorities must make administrative determinations regarding particular inmates. For example, it must be decided, for classification purposes, where the inmate will be incarcerated in a particular type of institution. It is also necessary to determine how best to allocate the limited resources of the prison system, such as allotments of openings in particular classes and use of library and exercise facilities, among particular inmates. Such determinations concern administration of prison resources and are non-adversarial in nature. *See* page 1237 *infra*. Second, there are minor disciplinary matters. Finally, there are major disciplinary determinations. Attempts to draw a hard and fast distinction between these latter two categories might well prove illusory. Whether a disciplinary determination is major or minor will ordinarily revolve around two factors : the relative gravity of the offense and the nature of the consequences that may result from finding a prisoner guilty of the offense. *Cf. Baker v. City of Fairbanks*, 471 P.2d 386 (Alaska 1970).

7. *Wolff v. McDonnell*, 418 U.S. 539, 564, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935, 956 (1974). As to notice, the Supreme Court stated :

We hold that written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance

. . . .

We note that the Division's current regulations do not provide for written notice concerning major infractions.

8. *Id. See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

At oral argument, counsel for appellants conceded that the existing regulations pertaining to the discipline of Alaskan prisoners are defective in that they fail to explicitly require reasons for the disciplinary decisions to be made and entered of record.

9. *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935, 956-57 (1974). In reaching this holding the Supreme Court stated :

Ordinarily, the right to present evidence is basic to a fair hearing ; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that as individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence ; but here we must balance the inmate's interest

facing a complex issue, as to which it is unlikely that he will be able to collect and present evidence necessary for an adequate comprehension of the case, to seek the aid of a fellow inmate, " . . . or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff."[10]

The state, undoubtedly cognizant of the binding impact of *Wolff* under the Supremacy Clause, does not appeal from those portions of the superior court's decree which parallel *Wolff* standards. However, in its final judgment, the superior court went significantly beyond *Wolff* in ruling that inmates of Alaska prisons must be allowed the unqualified right of confrontation and cross-examination in both disciplinary and classification proceedings; in requiring that the hearing officers in disciplinary proceedings be drawn from sources outside of the Division of Corrections; by requiring a verbatim record of the disciplinary and classification proceedings; by providing that the inmate has the right of an automatic appeal from disciplinary or classification decisions to the superior court; and holding that inmates faced with major infraction charges

be granted assistance of counsel (or appointed counsel if unable to afford an attorney). It is from these facets of the superior court's judgment that this appeal has been brought.

■ Analysis of the six subject areas in which the superior court's decree is broader in scope than *Wolff* leads us to the conclusion that they can be grouped under two major headings, more particularly: procedures furthering the goal of attaining a fair hearing and decision, and procedures which guaranty an adequate review of the procedures employed and decisions reached by the hearing officers. Turning initially to the "fair-hearing/fair-decision" aspects of the superior court's decree, it is necessary to ascertain the nature of inmate disciplinary proceedings. As to this question, we are in agreement with *Wolff* that a disciplinary hearing is not a criminal trial. The inmate is not charged with a violation of criminal statute, nor is the inmate's liberty as a free citizen threatened by potential curtailment. Thus, in accord with *Wolff*, we hold that an inmate in a major disciplinary proceeding is not entitled to the full panoply of rights due an accused in a criminal proceeding.[11] Our conclusion

---

in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case.

10. *Id.* at 570, 94 S.Ct. at 2982, 41 L.Ed.2d at 959.

11. Current Alaskan prison regulations define "minor infractions" to include "any non-conformity or misconduct or infraction of the institutional rules and regulations which does

not constitute a direct danger to person or property, and is not punishable in a court of law."

The Division's regulations also contain a category labeled "Minor Acts of Nonconformance," which as defined are those acts which may be corrected by the observing employee without referral to a higher authority.

The term "major infractions" is defined as "conduct which constitutes a direct danger to persons, property, the security of the institution (the Superintendent of each institution shall determine what constitutes a danger to the institution), misdemeanors, felonies, any crime punishable in a court of law, or a series of minor infractions within a 60-day period for which guilt has been established in disciplinary committee hearings."

The regulations alternatively define "major infraction" in part as including "five (5) minor violations if they have occurred in the past two (2) months and indicate a pattern of misbehaviour."

When dealing with major infractions, the disciplinary committee can, from amongst its

is grounded in the belief that to a significant degree disciplinary proceedings must be structured by prison authorities. The relevant background for constitutional adjudication in prison disciplinary proceedings is skillfully illuminated by Mr. Justice White, in *Wolff*, where he writes:

> The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonisms on the important aims of the correctional process.

> Indeed, it is pressed upon us that the proceedings to ascertain and sanction misconduct themselves play a major role in furthering the institutional goal of modifying the behavior and value systems of prison inmates sufficiently to permit them to live within the law when they are released. Inevitably there is a great range of personality and character among those who have transgressed the criminal law. Some are more amenable to suggestion and persuasion than others. Some may be incorrigible and would merely disrupt and exploit the disciplinary process for their own ends. With some, rehabilitation may be best achieved by simulating procedures of a free society to the maximum possible extent; but with others, it may be essential that discipline be swift and sure. In any event,

it is argued, there would be great unwisdom in encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution.[12]

■ It is against this setting that we must determine whether the holdings of *Wolff* delineate the full extent of due process rights which must be accorded prison inmates under Alaska's constitution. For in the past, this court has stated that we are not bound by the Supreme Court's interpretation of federal constitutional provisions when interpreting parallel provisions of the Alaska Constitution. In this regard we have said that it is our duty to construe the Alaska Constitution in light of ". . . the intention and spirit of our local constitutional language and [to develop additional constitutional rights] . . . necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage." [13] With this introduction, we now reach the substantive issues raised by this appeal.

It will be recalled that the superior court directed the Commissioner of the Department of Health and Social Services to appoint hearing officers who were not otherwise affiliated with the Division of Corrections to conduct disciplinary proceedings. Such proceedings were, at the times in question, presided over by institutional staff personnel who were employees within the Division of Corrections. Composition of the disciplinary committees is

authorized options, impose segregated confinement for up to ten days, suspend privileges up to a period of sixty days, and recommend to the Superintendent forfeiture of good time.

12. *Wolff v. McDonnell*, 418 U.S. 539, 562–63, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935, 954–55 (1974) (footnote omitted).

13. *Baker v. City of Fairbanks*, 471 P.2d 386, 401–2 (Alaska 1970) ; *accord, Scott v. State*, 519 P.2d 774, 783–85 (Alaska 1974) ; *Alexander v. City of Anchorage*, 490 P.2d 910, 915 (Alaska 1971) ; *Whitton v. State*, 479 P.2d 302, 309 (Alaska 1970) ; *Roberts v. State*, 458 P.2d 340, 342 (Alaska 1969).

**1228**

reflective of the Division's regulations which provide:

A disciplinary committee will be composed of three members—the Assistant Superintendent or, in his absence, a senior Correctional Officer II will serve as chairman of the disciplinary committee. Two other staff members will be assigned to the disciplinary committee by the Superintendent. With the consent of the accused offender, another offender may serve as a member of the disciplinary committee. Personnel involved in the infraction or who have made a report concerning the infraction will not act as members of the disciplinary committee hearing the case.

■ Unquestionably the due process clauses of the federal constitution and Alaska's constitution require that the disciplinary hearing be conducted before an ". . . impartial tribunal . . ."[14] On review of this record, we are unable to accept the superior court's conclusion that a hearing body composed of prison officials, or prison officials and inmates, is necessarily not a neutral and detached tribunal which is capable of following fair procedures and rendering fair decisions. Here the record fails to demonstrate a pattern of biased disciplinary tribunals operating within the various correctional institutions throughout the State of Alaska.[15]

Prison disciplinary procedures are not equivalent to criminal proceedings because the inmate who is the subject of a disciplinary proceeding is not technically charged with a crime. Were this the case, the only tribunal which could determine guilt or innocence would be a court of law. Rather, the inmate is charged with a major infraction which is defined as ". . . conduct which constitutes a direct danger to persons, property, the security of the institution . . ., misdemeanors, felonies, any crime punishable in a court of law, or a series of minor infractions within a 60-day period for which guilt has been established in disciplinary committee hearings." The inmate found guilty in a prison disciplinary hearing is no more or less a criminal than he was before commencement of the hearing. Substantial institutional interests other than criminality are involved in disciplinary hearings insofar as the disciplinary committee is required by the Division's regulations to "maintain proper control, conserve human values and the individual's dignity, as well as to promote desirable changes in attitude and behaviour on part of the offender." Insofar as knowledge of the conditions of the prison environment is important to an understanding of the significance of events which occur therein, prison officials and offenders theoretically comprise an ideal disciplinary hearing committee. We therefore can find no basis for concluding that the composition of disciplinary boards under the Division's regulations present such a hazard of arbitrary decisionmaking that it should be held violative of due process of law under Alaska's constitution.[16]

■ Our analysis of the nature of the prison disciplinary process is also relevant

14. *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 357 (Alaska 1971) ; *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1970) ; *see Aguchak v. Montgomery Ward Co.,* 520 P.2d 1352 (Alaska 1974) ; *Wortham v. State,* 519 P.2d 797 (Alaska 1974) ; *Bush v. Reid,* 516 P.2d 1215 (Alaska 1973) ; *cf.* AS 44.62.450; AS 44.-62.570(b)(2).

15. *See In re Cornelius,* 520 P.2d 76 (Alaska 1974), where we held that due process is not necessarily offended by a combination of investigative and judicial functions within an agency. *See also In re Hanson,* 532 P.

2d 303 (Alaska 1975), where, as here, no witness or charging officer may sit in judgment. We are satisfied, under the record in this case, that due process is not offended.

16. *See Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935, 959–60 (1974).

Admittedly there exists the possibility that mere membership on a disciplinary committee can produce a biasing effect. Unless the need for impartiality is constantly stressed, committee members may simply support other correctional officers. We, therefore, urge appellants to give consideration to a policy calling

to the question of the standard of proof which should control determinations of guilt at the disciplinary hearing. The Division's regulations provide that:

> An offender cannot be found guilty of an alleged major or minor infraction unless a disciplinary committee is convinced from the evidence presented at the hearing that the offender's guilt is substantially more probable than his innocence.

Admittedly, findings of criminality may serve as a basis for disciplinary action, but it is not criminality per se with which disciplinary committees are concerned. The focus of the disciplinary hearing is to determine whether there has been compliance or noncompliance with administrative rules and regulations governing the regime of the correctional institution.

Since we are of the view that disciplinary proceedings are not criminal proceedings within the intendment of Alaska's constitution, we are not convinced that a reasonable doubt standard of proof is mandated. Thus, we hold that the Division's adoption and use of the guilt determination criterion of "substantially more probable than . . . innocence" is not violative of Alaska's constitution and affords adequate protection to the inmate in disciplinary proceedings.[17]

The right to call witnesses to present evidence in one's own favor, to confront, and to cross-examine witnesses are rights intended to ensure fair and accurate decision-making. As Justice Marshall observed in his dissent in *Wolff*:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [hearing body] so it may decide where the truth lies.[18]

In the context of in-prison proceedings, "[t]he right to present the testimony of impartial witnesses and real evidence to corroborate his version of the facts is particularly crucial to an accused inmate, who obviously faces a severe credibility problem when trying to disprove the charges of a prison guard."[19] Countervailing considerations also exist in prison settings. The unrestricted right to call witnesses from the inmate and correction population ". . . carries obvious potential for disruption and for interference with the swift punishment that . . . may be essential to carrying out the correctional program of the institution."[20] Consequently, the Supreme Court in *Wolff* concluded that, insofar as calling witnesses and presenting documentary evidence is at issue, the inmate should be allowed this right ". . . when permitting him to so do will not be unduly hazardous to institutional safety or correctional goals."[21]

---

for the staffing of disciplinary committees by senior personnel and possible "outsiders" such a probation and parole personnel.

*See* Survey of Prison Disciplinary Practices and Procedures, p. 16, ABA Commission on Correctional Facilities and Services (December 1974).

17. *See* Standard 2.12, Corrections, National Advisory Commission on Criminal Justice Standards and Goals (1973). This standard in part states: "The hearing officer or board should be required to find substantial evidence of guilt before imposing a sanction." *Compare In re Hanson*, 532 P.2d 303, 307–08 (Alaska 1975).

18. *Wolff v. McDonnell*, 418 U.S. 539, 583, 94 S.Ct. 2963, 2988, 41 L.Ed.2d 937, 966

(1974), quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967).

Twenty eight states presently permit the inmate to call witnesses, confront witnesses and cross-examine adverse witnesses with certain limitations. *See* Survey of Prison Disciplinary Practices and Procedures, pp. 18–20, ABA Commission on Correctional Facilities and Services (December 1974).

19. *Wolff v. McDonnell*, 418 U.S. 539, 583, 94 S.Ct. 2963, 2988, 41 L.Ed.2d 935, 966 (1974). (Marshall, J., dissenting).

20. *Id.* at 566, 94 S.Ct. at 2979, 41 L.Ed.2d at 956.

21. *Id.*

Existing regulations of the Division of Corrections covering the subject of witnesses provide:

> The chairman of the disciplinary committee may call for evidence or witnesses as he deems appropriate. The employee who brought the charge will be *REQUIRED* to appear for questioning if the accused offender, through his staff advocate, so requests. Questioning of every witness will usually be conducted by the committee chairman. The chairman has the right to limit testimony and to prevent repetitious or irrelevant questioning. The accused offender's staff advocate will be given opportunity to question any witness. In the event the offender is found guilty, the staff member assigned to assist him shall file a report to be attached to the completed committee report listing all persons who the offender requested to appear, but were not called to testify. This report will contain a brief statement of the reason why these people were not called.[22]

The superior court, in its decree, did not explicitly deal with the question of an inmate's right to call witnesses and present documentary evidence, although the court did decree in part that the inmate faced with a major infraction disciplinary proceeding has the right to represent himself. Before this court, appellees advance the argument that inmates are entitled to complete due process at disciplinary hearings. Justice Douglas' dissent in *Wolff* is relied upon as supportive of their position that due process accords inmates the right to call witnesses and present documentary evidence in their own behalf.

---

22. *Id.* at 593–601, 94 S.Ct. at 2993–2997, 41 L.Ed.2d at 972–77.

The Division's regulations inform the inmate that if he has

. . . evidence or witnesses now in the institution with facts which are directly related to the incident, your staff advocate will check them out and report his findings to the committee. You will be allowed to call witnesses, including the employee who wrote the charges, if both your staff advocate and the committee chairman feel the

As to the United States Supreme Court's balancing of the constitutional rights of prisoners to call witnesses and present evidence with the needs of the prison institution, we differ. We fail to see how the right to call witnesses and present documentary evidence will create discipline problems which outweigh the fundamental value these rights provide as vehicles for ascertaining the truth. Absent a right to establish the most basic elements of a defense through presentation of evidence, a disciplinary hearing cannot be characterized as fair in' the due process sense. As Justice Marshall reiterated, "[T]he Due Process Clause 'recognizes higher values than speed and efficiency' . . ."[23]

To the extent that the calling of witnesses and presentation of evidence is repetitious or irrelevant, the chairman of the disciplinary committee is vested with the discretion under the Division's regulations, to limit testimony and the production of other evidence. In the exceptional case, where it is clearly shown that the calling of a particular witness may create a risk of reprisal or undermine prison authority, the chairman of the disciplinary proceeding must necessarily be vested with authority to refuse to call such witness.[24]

Concerning an inmate's right to confront and cross-examine witnesses, the superior court decreed that an inmate charged with a major infraction has the right of:

> . . . confrontation of the witnesses against him including cross-examination by his attorney or staff advocate or the inmate himself if unrepresented.

In *Wolff*, the Supreme Court concluded that the due process clause ". . .

> personal testimony is necessary in reaching a fair conclusion and disposition of the charges.

23. *Id.* at 583, 94 S.Ct. at 2988, 41 L.Ed.2d at 967.

24. When limiting the calling of inmate witnesses or the production of documentary evidence, the chairman of the disciplinary hearing should indicate on the record the reasons for any such curtailment.

should not be read to impose the procedure [of confrontation and cross-examination at disciplinary hearings] at the present time . . . ." [25] Stating that these rights offer "hazards to institutional interests" and are not "universally applicable to all hearings," [26] the Supreme Court placed emphasis on the dangers of retribution within the prison walls when the inmate subject of the hearing knows who testified against him, as well as the deleterious effect on discipline a searching cross-examine might have in terms of future respect to be accorded that authority's orders.

■ We start with the premise that the rights to confrontation and cross-examination are fundamental prerequisites to a fair hearing. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," and "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." [27] Admittedly, there are situations where the inmate's rights of confrontation and cross-examination in disciplinary hearings could become erosive of authority and order in prison. In such circumstances the rights of confrontation and cross-examination must give way to the legitimate needs of the institution and correctional authorities.

■ The institutional needs with which we are concerned do not encompass mere institutional administrative efficiency;

rather our concern centers on preservation of confidentiality of inmate-informers and the need to protect them from the danger of reprisals. Tensions inherent between implementation of the rights of confrontation and cross-examination and legitimate institutional needs of this character are not subject to easy resolution. We are cognizant of the difficulties involved in obtaining information from the prisoner's society, but concern for legitimate institutional needs does not, in our view, justify a blanket denial on the part of inmates to confront and cross-examine adverse witnesses.[28]

■ We thus conclude that an inmate should have the right to call witnesses and the right of cross-examination unless there are compelling reasons such as those disclosed in this opinion for abridging those rights. In the event that the chairman of a disciplinary committee does not allow confrontation or cross-examination, the denial and reasons for the denial must be made a part of the record.

■ This brings us to the last remaining issue under the "fair-hearing/fair-decision" aspects of the superior court's decree. The superior court ruled that an inmate charged with a "major infraction who is to face non-judicially imposed discipline or an inmate who is subject to lose any amount of good time" has the right to have the assistance of both a staff advocate and, if he chooses, an attorney from

25. *Wolff v. McDonnell*, 418 U.S. 539, 568, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935, 959 (1974).

26. *Id.* at 567, 94 S.Ct. at 2980, 41 L.Ed.2d at 957.

27. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974). *See* 5 J. Wigmore, Evidence § 1395 (Chadbourne rev. 1974).

28. The Division of Corrections' current regulations state, as to witnesses and the rights of confrontation and cross-examination, the following:

The employee who brought the charge will be *REQUIRED* to appear for questioning if the accused offender, through his staff advocate, so requests. Questioning of every

witness will usually be conducted by the committee chairman. . . . The accused offender's staff advocate will be given opportunity to question any witness. . . .
Inmates will not be permitted to question witnesses directly.
We also think there is considerable merit in Justice Marshall's suggestion that
[w]henever the right to confront an adverse witness is denied an accused, . . . the disciplinary board has the constitutional obligation to call the witness before it *in camera* and itself probe his credibility, rather than accepting the unchallenged and otherwise unchallengeable word of the informer.
*Wolff v. McDonnell*, 418 U.S. 539, 590, 94 S.Ct. 2963, 2991, 41 L.Ed.2d 935, 970 (1974).

the Public Defender Agency. The Division's regulations provide that the inmate offender accused of a major infraction must be advised that ". . . he will be assigned a staff member to investigate the incident and to assist him at the hearing." [29] The regulations do not provide for representation by counsel apart from the services of a staff advocate.

The Supreme Court in *Wolff* concluded that

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings. [30]

In concluding that the due process clause did not give the accused inmate in a major disciplinary hearing the right to either retained or appointed counsel, the Supreme Court placed heavy reliance upon *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). In *Scarpelli*, the Supreme Court addressed the question of the right to counsel in parole and probation revocation proceedings. There the Supreme Court was of the view that introduction of counsel into revocation hearings would result in significant alteration of the character of the proceedings in that the hearing board itself would become less "predictive and discretionary" and,

> . . . less attuned to the rehabilitative needs of the individual probationer or parolee. In the greater self-consciousness of its quasi-judicial role, the hearing body may be less tolerant of marginal deviant behavior . . . . [31]

In the main we find we are in agreement with the Supreme Court's analysis and disposition of the right to counsel issue when major disciplinary proceedings have been instituted against inmates. However, in disciplinary hearings where misconduct constituting a felony is charged, we feel a departure from the general no-counsel standard ordained by *Wolff* is in order. Explication of the reasons why we consider counsel necessary in this situation requires reference first to the Division's own regulations and then to the developing decisional law.

The Division of Corrections' regulations pertaining to major infractions involving conduct constituting felonies provide for referral to the local district attorney, together with a request that he advise the institution within five working days whether prosecution will be undertaken. If the district attorney informs the institution that

---

29. The regulations additionally state that:

The staff advocate will be appointed to assist the inmate in presenting his case and to assist him in bringing out the facts of the incident. The staff advocate will be assigned for all major offenses brought before the Disciplinary Committee. An inmate may request the assistance of a staff advocate for a minor offense violation.

Twenty nine states provide for counsel-substitutes in major disciplinary hearings, while fourteen states and territories allow retained counsel, and in certain circumstances appointed counsel. Survey of Prison Disciplinary Practices and Procedures, p. 22, ABA Commission on Correctional Facilities and Services (December 1974).

30. *Wolff v. McDonnell*, 418 U.S. 539, 570, 94 S.Ct. 2963, 2981, 41 L.Ed.2d 935, 959 (1974).

The Division's regulations are reflective of a somewhat similar attitude:

The adversary or prosecution versus defense process has no place in disciplinary procedures because it implies the winner-loser situation where the facts may be obscured or distorted for strategic purposes. The staff advocate is an unbiased agent who objectively checks out reports on what the inmate may describe as inconsistencies or admission [sic] from the official charge and reports. During the hearing, the staff advocate may question witnesses on behalf of the inmate.

31. *Gagnon v. Scarpelli*, 411 U.S. 778, 787–88, 93 S.Ct. 1756, 1762, 36 L.Ed.2d 656, 665 (1973).

prosecution will be undertaken and the case goes to trial, there will be no further disciplinary action taken by the institution against the offender for the particular conduct. An offender who is transferred to "specialized housing" pending disposition of the incident forwarded to the local district attorney will be immediately referred to the institution's classification committee.[32] The classification committee must determine at its next regularly scheduled meeting if the offender can be returned to his regular program, admitted to a modified program, or must be retained in a specialized housing unit pending final disposition by the district attorney.[33] Of particular significance are the Division's regulations pertaining to *Miranda* warnings. In instances where the inmate is accused of a felony and has been transferred to segregated housing while awaiting decision by the district attorney, the classification committee's normal procedures are modified in the following respects:

> The offender will be advised that he need not appear before the committee. If the offender appears before the committee, he will be advised that it is for the purpose of determining the appropriate program for him during disposition of the charges by the District Attorney, and the committee will not discuss the details of the charges. The offender will also be given the full *Miranda* warning. The offender must be admonished that he need not make any statement but, if he does, he should confine himself to stating the reasons why he feels he should or should not be assigned to segregated housing. In no case, will a committee make assumptions regarding guilt based upon the offender choosing to exercise his right to remain silent. Continued housing in a segregated unit pending disposition of a matter referred to the District Attorney will be reviewed frequently, or at the next regular meeting of the classification committee.

Two opposing views have been taken subsequent to *Wolff* regarding the propriety of according the inmate the right to counsel when the charged infraction constitutes a crime which is punishable in a court of law. The First and Ninth Circuits, in dictum, have stated that an inmate accused of perpetrating a crime is entitled to the assistance of counsel in prison disciplinary proceedings.[34]. Both circuits ground their views on *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed. 2d 381 (1968), where the Supreme Court held that the interrogation of an incarcerated taxpayer by an Internal Revenue Service Agent, where criminal charges may result, whether or not the interrogation was intended to obtain evidence for a

---

32. The regulations call for a classification committee of three:

> The Assistant Superintendent or senior Correctional Officer II will serve as chairman of the committee. Two other individuals will be appointed by the chairman of the committee. Probation and parole personnel who are familiar with the offender and his case being classified, will be encouraged to serve on the classification committee.

33. Under the Division's regulations, continued retention in a specialized housing unit pending disposition of the charges by the district attorney is warranted only when:

> a. The offender has a record of imminently assaultive behavior.
> b. The offender presents an escape risk of unusual seriousness or persistence.
> c. The offender has requested or appears to require protective custody.

d. The psychiatrist or physician prescribed segregation based upon the offender's mental condition.
e. The safety and security of the institution will be threatened if the offender is not placed in restricted housing.

> In reaching a decision, the classification committee must consider the severity of the offense charged and must assume the offender not guilty of the offense.

34. *Clutchette v. Procunier,* 497 F.2d 809 (9th Cir. 1974), *modified,* 510 F.2d 613 (1975), *cert. granted sub nom Enomoto v. Clutchette,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975) ; *Palmigiano v. Baxter,* 510 F.2d 534 (1st Cir. 1974), *modifying* 487 F.2d 1280 (1973), *vacated and remanded, Baxter v. Palmigiano,* 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974), *cert. granted,* 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

criminal prosecution and whether or not related to the offense for which the inmate has been imprisoned, is "custodial interrogation" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). In *Procunier*, the Ninth Circuit expressed the view that, "It follows from *Mathis* that if the disciplinary committee directed questions at the accused inmate, he would be subject to 'custodial interrogation' and would have a Fifth Amendment right to remain silent and a right to be represented by counsel (retained or appointed) while subject to such questioning."[35] Similarly, the First Circuit concluded that the right to counsel in disciplinary proceedings where future prosecution is a realistic possibility is governed by *Miranda:* "[I]n cases where criminal charges are a realistic possibility, prison authorities should consider whether defense counsel, if requested, should not be let into the proceeding, not because *Wolff* requires it in that proceeding, but because *Miranda* requires it in light of future criminal prosecution."[36]

Taking a position somewhat contrary to that of the First and Ninth Circuits, the New Jersey Supreme Court recently held that an inmate is unqualifiedly not entitled to counsel in prison disciplinary hearings.[37] As a corollary proposition, the court held that all prisoners are entitled to use immunity in any prison disciplinary proceeding. Following the reasoning of the federal district court of Florida,[38] the New Jersey Supreme Court noted that even with counsel present in the prison disciplinary hearing the prisoner would face the "constitutionally obnoxious dilemma" of remaining silent at the disciplinary hearing (thereby sacrificing his right to defend himself insofar as the accused is usually his own best witness) or speaking at such hearing and then facing the risk of making self-incriminatory statements.[39] Determining that ". . . the injection of a right to formal retained or assigned counsel . . . would be wholly incompatible with New Jersey institutional needs and capacities and, . . . unessential to protection of the inmate's rights",[40] the New Jersey court declined to follow the First and Ninth Circuits. Instead, the court adopted the solution of the United States District Court for the Middle District of Florida,

35. *Clutchette v. Procunier*, 497 F.2d 809, 823 (9th Cir. 1974). The Ninth Circuit further concluded that in such circumstances the inmate's silence may not be used against him by the disciplinary board.

36. *Palmigiano v. Baxter*, 510 F.2d 534, 537 (1st Cir. 1974).
 In *Procunier*, the Ninth Circuit, referring to *Palmigiano v. Baxter*, 487 F.2d 1280 (1st Cir. 1973), suggested in a footnote that if the inmate is provided with use immunity he may be forced to speak without counsel. 497 F.2d at 823–24 n. 23. The First Circuit disagreed with both its earlier decision and *Procunier* and in *Palmigiano* on rehearing held that, "[A]n inmate subjected to . . . interrogation is entitled to be advised of his right to remain silent, and cannot be further interrogated should he choose not to speak." 510 F.2d at 536. This position taken by the First Circuit was based on three grounds: (1) that no adverse inference may be drawn from silence in disciplinary hearings where the issue involves criminal behavior but as a practical matter the inmate is often faced with the choice of testifying to self-incriminating matters or letting the hearing be decided against him; (2) that " . . . allowing prison officials to coerce testimony where they wish by extending immunity . . . cheapens the Fifth Amendment"; and (3) that since prison officials themselves lack the authority to grant immunities, formal judicial proceedings and a full stenographic transcript would be required.

37. *Avant v. Clifford*, 67 N.J. 496, 341 A.2d 629 (1975).

38. *Sands v. Wainwright*, 357 F.Supp. 1062, 1092–93 (M.D.Fla.1973), *vacated and remanded* (for consideration by a three-judge district court), 491 F.2d 417 (5th Cir. 1973), *cert. denied sub nom., Guajardo v. Estelle*, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974).

39. The New Jersey court later notes that the limited procedural safeguards to which a prisoner is entitled by the authority of *Wolff* make "an inmate's decision to remain silent . . . tantamount to a sacrifice of his defense." *Avant v. Clifford*, 67 N.J. 496, at 539, 341 A.2d 629, at 653 (1975).

40. *Id.* at 537, 341 A.2d at 651.

and held that the dilemma (of testifying and sacrificing one's Fifth Amendment right to remain silent or of not testifying and sacrificing much of the inmate's defense, as well as raising a question of good faith in the hearing body's mind) disables a prisoner from ever making a free and rational choice. The New Jersey Supreme Court therefore concluded that a prisoner has use immunity for all statements made at a prison disciplinary hearing.[41]

We decline to follow *Avant* and hold that an accused inmate, who has been transferred to specialized housing pending decision by the district attorney regarding whether prosecution for felonious conduct will be undertaken, must be afforded counsel at any appearance before the classification committee or at any related disciplinary hearing.[42]

Given *Miranda* and *Mathis,* we believe that counsel, either retained or appointed, is required in the situation where the inmate's alleged infraction of the institution's regime consisted of conduct which potentially constitutes a violation of the state's felony laws. As we have noted, under the Division's regulations, in such circumstances referral to the district attorney

is required, and pending his determination and possibly the outcome of the trial, the inmate can be housed in "specialized housing." In light of the possibility of prolonged specialized housing pending disposition of the conduct referred to the district attorney's office, the possible loss of other privileges, the close nexus with possible criminal prosecution, and the inherently coercive circumstances flowing from the interim imposition of specialized housing and suspension of other prison privileges, we believe that *Miranda* rights can be best assured through provision of counsel to the inmate.

We now address the subject of review of a disciplinary committee's decisions. The superior court's decree provided that an inmate found guilty of a major infraction, in a disciplinary hearing, has an automatic right of appeal to the superior court.[43] The Division of Correction's regulations contain detailed procedures pertaining to notice of the decision and advisement of the right to appeal. A two-level appeal going initially to the institutional superintendent and then to the Director of the Division of Corrections is provided by the regulations.[44] Since

41. *Id.* at 541–543, 341 A.2d 629.

42. The National Advisory Commission on Criminal Justice Standards and Goals, Report on Corrections at 26, 52, recommends the presence of counsel in major disciplinary hearings, regardless of whether a crime is charged.

43. This portion of the superior court's judgment states that an inmate shall have the right

 . . . to submit his notice of appeal . . . to the Superior Court by filing a complaint within ten working days. The Superior Court will consider the tape recording of the proceedings and shall employ the same standard of review as is employed in reviewing the criminal decision appeal from the District Court. . . .

44. Applicable Division regulations pertaining to appeals provide:

 Each offender heard by the disciplinary committee will receive verbal notification of the committee's decision immediately after a decision has been reached. The decision refers to innocence or guilt and the

action to be taken when guilt has been established. Within 72 hours after a decision has been reached, the offender shall receive a written notice of the disciplinary committee's decision to include a notice of the right to appeal.

The institutional superintendent is the first level of appeal. An appeal to the Superintendent must be submitted in writing within 72 hours after receipt of the written notification of the disciplinary committee's action. The Superintendent has 72 hours after receipt of the written appeal to notify the offender in writing of the action taken. The Superintendent may take the following action:

1. Confirm the decision of the disciplinary committee.

2. Reduce or suspend any penalty imposed by the disciplinary committee.

The final level of appeal is the Director. An appeal to the Director must be submitted in writing within 72 hours after receipt of the written notification of the Superintendent's action. The Director has 72 hours after receipt of the written appeal to notify

*Wolff* acknowledges that a prison disciplinary proceeding is not a criminal prosecution, the superior court's ruling that the prisoner is entitled to an automatic appeal to the superior court is not required by the federal constitution. Nor is a right to an automatic appeal, as a matter of due process, required by Alaska's constitution. We hold that the administrative appeals provided by the Division's regulations are not constitutionally defective.[45] In our view, the primary law source for resolution of disciplinary proceeding issues is the Division of Correction's regulations. Interpretation and application of these regulations should be, and is, committed in the first instance to employees of the Division of Corrections and inmates together with two levels of administrative appeals.

 Concerning the nature of the record required of disciplinary hearings, *Wolff* held merely that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action."[46] In the case at bar, the superior court decreed that a tape recording of the entire disciplinary proceeding is essential. Here we are in agreement with the superior court. In our view, the requirement of a verbatim record will help insure that administrators faced with possible scrutiny by state officials and the public, and even the courts when it is asserted that fundamental constitutional rights may have been abridged, will act fairly. A verbatim record of the proceedings will furnish a more complete and accurate source of information than the

"written statement" requirement of *Wolff*, will assist in facilitating a more intelligent review of the disciplinary proceeding, and moreover, the use of cassettes and other means of recording hearings may well prove less burdensome than the written statement requirement.

What we have said thus far concerns the inmate's due process rights in major disciplinary hearings. To summarize, we have held that Alaskan prisoners are entitled, under the Alaska Constitution, to all due process rights enunciated in *Wolff*. Further, we have concluded that Alaska's constitution requires greater due process protections than the United States Constitution in the following respects: a prisoner has the right to counsel in conjunction with major disciplinary proceedings when felony prosecution may result; the right to call witnesses and produce documentary evidence in his favor (subject to the limitations discussed previously); the right to confront and cross-examine witnesses; and the right to have the entire hearing recorded for purposes of administrative appeal and potential further appeal to the superior court. In the following aspects, we agree with the United States Supreme Court's decision in *Wolff* and find that the Alaska Constitution affords an inmate of our penal system no greater protection than the United States Constitution: a disciplinary proceeding is not a criminal proceeding, thus the inmate has no automatic right of appeal to the courts of Alaska; the standard of proof, in disciplinary hearings, of violation of prison rules is not "beyond a reasonable doubt,"; and, while the inmate

the offender in writing of the action taken. The Director may take the following action:
 1. Confirm the decision of the Superintendent.
 2. Reduce or suspend any penalty imposed by the disciplinary committee or the Superintendent.
The Superintendent and the Director may not increase the penalty imposed by the disciplinary committee.

45. If fundamental constitutional rights are alleged to be abridged in disciplinary proceedings, it would be the duty of the court to

inquire into the allegations. *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351 (Alaska 1971); *see Nichols v. Eckert,* 504 P.2d 1359 (Alaska 1973); *Etheredge v. Bradley,* 502 P.2d 146 (Alaska 1972); *RLR v. State,* 487 P.2d 27 (Alaska 1971); *Fenner v. Bassett,* 412 P.2d 318 (Alaska 1966). *Cf. Wolff v. McDonnell,* 418 U.S. 539, 584, 94 S.Ct. 2963, 2988, 41 L.Ed.2d 935, 967 (Marshall, J., dissenting).

46. *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935, 957 (1974).

is entitled to a fair and impartial hearing, it is not constitutionally impermissible for the hearing to be conducted by employees of the prison system.

■ As we have previously noted, prison disciplinary hearings may result in a range of sanctions. To the extent the potential sanctions are of a lesser effect on the prisoner's "liberty," not all of the procedural safeguards constitutionally necessary in major disciplinary proceedings are required. We thus distinguish between those disciplinary proceedings which threaten major deprivations of a prisoner's limited liberty and those which do not. In all disciplinary hearings the problem is discipline—a compelling concern for an efficient, as well as effective, prison regime. To the extent the disciplinary action affects the prisoner's life in a relatively minor fashion, we think the need for effective discipline outweighs the inmate's right to the fuller procedural array to which he is entitled in major disciplinary proceedings.[47] We thus hold that the prisoner who is the subject of minor disciplinary action by the prison authority is entitled to no more due process than a right to be heard by fair and impartial officials of the prison system whose disposition of the matter, coupled with the reasons for the decision, is made part of a complete record. Additionally, the offender is entitled to the benefit of the Division's disciplinary procedures relating to minor infractions.

■ Finally, with reference to the due process claims raised in the appeal as they relate to classification proceedings, we hold that decisions of prison authorities relating to classification of prisoners are completely administrative matters regarding which the inmate has no due process rights beyond the expectation of fair and impartial allocation of the resources of the prison system to its charges. As an extension of the state, the Division of Corrections must administer Alaska's prisons in a manner which is neither arbitrary nor vindictive. However, resource allocation is an executive concern involving many day to day decisions which necessitate that court interference be kept to a minimum.[48] To the extent that a classification action or proceeding is based on considerations of discipline, the situation is otherwise. When discipline is a motivation for state action, the concern is not merely administration of prison resources to the needs of the individual inmate. There is also a violation of the institution's regulations, as well as possibly the criminal code. When administrative action is a pretext for disciplinary action,[49] the Alaska Constitution will afford the inmate the greater due process protections we have previously outlined in this opinion.

■ Two additional issues are raised by way of cross-appeal from the judgment below. First, appellees, in their cross-appeal, argue that they have a fundamental right of marital privacy which subsumes conjugal visitation and that the state has shown no compelling interest which justifies abridgment of that right. The thrust of the argument below was that denial of

---

47. For example, it would completely frustrate prison discipline to require a lawyer for an inmate threatented with removal from a baseball team for a week as a consequence of "razzing" a guard. We expect that the present definitions of major and minor infractions will furnish a useful working guideline with which to determine whether the full procedural rights array is necessary. This presumes the potential actions of the disciplinary committee correlate with the grade of the offense.

48. We find strong indications of a legislative intent to leave the establishment, control, and management of the prison system in the hands of the Commissioner of the Department of Health and Welfare whenever practical under our constitution. *See* AS 33.30.010 *et seq.*

49. *See* Serrico, *Prisoner Classification and Administrative Decision Making*, 50 Texas L. Rev. 1229 (1972) ; Warren, *Classification of Offenders As An Aid to Efficient Management and Effective Treatment*, 62 J.Crim. L.C. & P.S. 239 (1971) ; Model Penal Code, § 304.1 (1962).

conjugal visitation constitutes cruel and unusual punishment. Both arguments have been virtually uniformly rejected by the courts [50] and were rejected by the superior court in this case. A balancing approach is useful in resolving this issue.[51] We find notions of privacy of the marital bed inconsistent with the compelling state interest in incarceration of offenders. One cannot be both in prison and in the sanctum of one's bedroom. The state is under no constitutional obligation to create such a sanctum within the prison walls.[52]

 In their cross-appeal, appellees also argue they are eligible to receive a minimum wage, absent which they have been denied equal protection.[53] They contend that they are entitled to the statutory minimum wage for working at institutional jobs. They concede that this is a frontier issue for consideration by this court and cite no cases in support of their contention.

Apart from the economic and social merits of the idea of prisoners working for wages rather than for meritorious good time and a $1 per day gratuity, the legal claim simply lacks substance. Neither the rehabilitation directive of the Alaska Constitution nor its due process clause require us to hold that inmates are entitled to a minimum wage. AS 23.10.065 is based on the federal Fair Labor Standards Act of 1938 and the terms used in the Alaska statute are defined in the same way as in the federal act.[54] A prisoner is not an "employee" of the state under the federal act,[55] and therefore is not so by virtue of AS 23.10.-065. Moreover, even were we to regard the inmates here as employees, state employees are excluded, by virtue of AS 23.-10.055(5), from the operation of the statute. Finally, the legislative history indicates that Congress did not intend the Fair Labor Standards Act to cover prisoners,[56]

50. *See, e. g., Polakoff v. Henderson,* 488 F.2d 977 (5th Cir. 1974), *aff'g* 370 F.Supp. 690 (N.D.Ga.1973) ; *Tarlton v. Clark,* 441 F.2d 384 (5th Cir.), *cert. denied,* 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971). *See also* Note, *Conjugal Visitation Rights and the Appropriate Standard of Judicial Review for Prison Regulations,* 73 Mich.L.Rev. 398 (1974) (see cases collected in note 8).

51. The Eighth Circuit has used such a test, holding that " . . . when the claim is that a prison regulation infringes upon a constitutional right, 'a court must balance the asserted need for the regulation in furthering prison security or orderly administration against the claimed constitutional right and the degree to which it has been impaired.'" *Moore v. Ciccone,* 459 F.2d 574, 576 (1972) quoting *Smith v. Robbins,* 328 F.Supp. 162, 164 (D.Me.1971), *aff'd,* 454 F.2d 696 (1st Cir. 1972). *See Ravin v. State,* 537 P.2d 494 (Alaska 1975). *See also* Note, *Conjugal Visitation Rights and the Appropriate Standard of Judicial Review for Prison Regulations,* 73 Mich.L.Rev. 398, 414 where the writer suggests that:
Such a balancing technique is not necessarily inconsistent with the established constitutional doctrine that deprivations of fundamental rights must be justified by compelling state interests. The state, through criminal convictions comporting with due process of law, has presumably shown compelling reasons for incarcerating prisoners.

The state thus has already shown a compelling interest in depriving convicted persons of those rights that are inconsistent with incarceration.

52. The state presents the additional argument, which we find persuasive, that sufficient opportunities for conjugal visits outside the institution exist by statute. *See* AS 33.30.-150; AS 33.30.260. *See also* Manual for Alaska State Adult Correctional Institutions §§ 401, 407. Because these statutes are in force and not challenged in their application by the inmates, we do not reach the question of whether in their absence the state must furnish equivalent opportunities to prisoners.

53. AS 23.10.065 provides:
An employer shall pay to each of his employees wages at a rate of not less than 50 cents an hour greater than the prevailing Federal Minimum Wage Law.

54. AS 23.10.145.

55. *Huntley v. Gunn Furniture Co.,* 79 F.Supp. 110 (W.D.Mich.1948) ; *Hudgins v. Hart,* 323 F.Supp. 898 (E.D.La.1971).

56. *See* S.Rep.No.884, 75th Cong., 1st Sess. 3–4 (1937) ; H.R.Rep.No.1452, 75th Cong., 1st Sess. 9 (1937) ; 81 Cong.Rec. 7652, 7672, 7885 (1937) ; 82 Cong.Rec. 1386, 1395, 1491, 1505, 1507 (1937) ; 83 Cong.Rec. 7283, 7298, 9260, 9265 (1938). *See generally* Note, *Minimum Wages for Prisoners: Legal Obstacles and Suggested Reforms,* 7 U.Mich.J.L.Reform 193 (1973).

and we find no indication that the state statute was not meant to have parallel "noncoverage." We simply cannot say that the distinction between prisoners in institutions and free citizens on the labor market is suspect.[57]

█ The inmates' argument under the rehabilitation clause of our constitution is that they have a constitutional right to a minimum wage because it furthers rehabilitation. In the case of prisoners "working along side of regularly paid employees", the result is alleged to be "damaging psychological effects of being relegated to an inferior and punishment receptive status." The problem with this argument is that we are not in a position to second-guess the prison authorities regarding how best to carry out their official functions.[58] Certainly when the work is not required but rather is wholly voluntary, we are not talking about the degradation of involuntary servitude. Further, we hesitate to underestimate the therapeutic value of work per se. If voluntary in nature, the simple experience of being physically or mentally occupied with a particular task can be a positive reward. Finally, we note it is standard procedure to award "good time" to those who choose to work. This reduction of time to be served would appear to be a reward which we, as free citizens, should not underrate. We prefer to leave such decisions in the hands of the Division.

In conclusion, we wish to emphasize that our decision today regarding prison procedures is " . . . not graven in stone." As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require futher consideration and reflection by the court.[59]

One additional aspect of the appeal remains. As indicated earlier, the scope of the superior court's judgment was comprehensive and extraordinarily detailed. Although we can appreciate the superior court's rationale for entering a decree of the scope and detail it did with this matter, nonetheless, we think it overly broad in view of the Division's current regulations. Therefore, upon remand, the decree should be amended to conform to this opinion and should be limited to the subjects covered in this opinion.

Affirmed in part, reversed in part.

---

57. The state concedes that an inmate would be entitled to the minimum wage while on work release and furlough programs, under the authority of AS 33.30.250(b). Under these circumstances AS 33.30.250(d) requires the inmate to pay the state for board and personal expenses.

58. In *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970) (footnotes omitted), in the context of a discussion of the criteria to be used for purposes of sentencing, we said:

Under Alaska's Constitution, the principles of reformation and necessity of protecting the public constitute the touchstones of penal administration. Multiple goals are encompassed within these broad constitutional standards. Within the ambit of this constitutional phraseology are found the objectives or rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves.

59. *Wolff v. McDonnell*, 418 U.S. 539, 571–72, 94 S.Ct. 2963, 2982–2983, 41 L.Ed.2d 935, 960 (1974).